**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>Plaintiff,<br><br>v.<br><br>**MARCO A. RAMIREZ; BEBE RAMIREZ; USA NOW, LLC; USA NOW ENERGY CAPITAL GROUP, LP; and NOW CO. LOAN SERVICES LLC;**<br><br>Defendants. | **Case No.:** |

## COMPLAINT

Plaintiff, the United States Securities and Exchange Commission (the "Commission"), files this Complaint against Defendants Marco A. Ramirez; Bebe Ramirez; USA Now, LLC; USA Now Energy Capital Group, LP; and Now Co. Loan Services, LLC (collectively "Defendants") and alleges:

## SUMMARY

1.     Since 2010, Defendants have perpetuated an investment scheme to defraud investors participating in the "EB-5 Program," a federal visa initiative designed to give foreign investors a legal path to U.S. residency.  Through its expedited investigation, the Commission has determined that Defendants have fraudulently offered and sold at least $5 million in securities to at least 10 investors.

2.     The EB-5 Program, administered by the Department of Homeland Security's United States Citizenship and Immigration Services ("USCIS"), was created by Congress in 1990 to stimulate the U.S. economy through job creation and capital investment by foreign

investors.  Under a pilot immigration program first enacted in 1992 and regularly reauthorized since, certain EB-5 visas are set aside for investors in Regional Centers designated by USCIS based on proposals for promoting economic growth.

3.      Starting in 2010, Defendants Marco and Bebe Ramirez and USA Now, LLC ("USA Now") sought approval from USCIS to register USA Now as a Regional Center.  EB-5 Regional Centers are supposed to accept and direct investments from foreign nationals into investment opportunities that satisfy the EB-5 visa requirements.  But even before USCIS approved USA Now as a Regional Center, the Ramirezes and other employees of USA Now had started soliciting investors and falsely promising them the opportunity to invest in a business that would give them the opportunity to obtain EB-5 visas.

4.      The Defendants initially targeted Mexican investors, and more recently have targeted investors in Egypt and Nigeria.  They told investors that USA Now would hold their investments in escrow until they received USCIS approval and that, once the funds were released from escrow, they would be used for specific business purposes.  But in fact, Defendants failed to hold the funds in escrow as required under the escrow agreements, and instead routinely diverted investor funds, often on the day received, to other undisclosed businesses or for personal uses that had not been described in offering materials.  Moreover, in at least one instance, Defendants used new investor funds to make a *Ponzi* payment to an existing investor.  None of the investors identified by the Commission to date have received even conditional visas, let alone green cards, from USCIS, and to the Commission's knowledge, none of the investors' funds remain in escrow.

5.      In July 2013, the FBI served a search warrant on the Defendants' offices and the Ramirez residence and seized various documents and certain assets, including cars that were apparently purchased using investor funds.  However, the Defendants continue to have control over bank accounts that may hold fraudulently obtained funds, and those funds remain at continuing risk of misappropriation.  Moreover, Marco Ramirez and one or more other USA Now representatives have continued to travel abroad soliciting new investors into the EB-5 program.

6.      By engaging in the conduct described in this Complaint, Defendants have engaged in a fraudulent scheme and have made materially false and misleading statements in connection with the purchase of securities in an unregistered securities offering, and thus have violated and may be continuing to violate Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

7.      In addition, each of the Defendants aided and abetted each of the other Defendants' violations of, and, unless restrained and enjoined, will continue to aid and abet violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

8.      Through this action, the Commission seeks to protect the interests of current and future investors.  As the fraud described is ongoing and is likely to continue, and investors' funds may remain at risk of being misappropriated, the Commission seeks emergency *ex parte* relief in this action to enjoin violations of the anti-fraud provisions of the federal securities laws, freeze assets, secure a preliminary injunction, and obtain other equitable relief.

## JURISDICTION AND VENUE

9.      The investments offered and sold by Defendants are "securities," as defined in Section 2(1) of the Securities Act [15 U.S.C. § 77(b)1)] and Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c(a)(10)].

10.     The Commission brings this action under the authority conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)] to temporarily, preliminarily, and permanently enjoin Defendants.

11.     This Court has jurisdiction over this action under Section 22(a) of the Securities Act of 1933 [15 U.S.C. § 77v(a)] and Section 27 of the Securities Exchange Act of 1934 [15 U.S.C. §§ 78u(e) and 78aa].

12.     Defendants have, directly or indirectly, made use of the mails and of the means and instrumentalities of interstate commerce in connection with the acts, transactions, practices, and courses of business described in this Complaint.

13.     Venue is proper in this district because certain of the acts, transactions, practices, and courses of business constituting the violations alleged in this Complaint occurred in the Southern District of Texas.

## PARTIES

14.     **Marco Ramirez**, age 42, resides in McAllen, Texas.  He is the Director of Operations for USA Now.

15.     **Bebe Ramirez**, age 39, resides in McAllen, Texas.  She is the "Director" and managing member of USA Now and a managing member of Now Co. Loan Services, LLC.

16.      **USA Now, LLC** is a Texas limited liability corporation with its principal place of business at 3700 N. 10th, Suite 210, McAllen, Texas 75201.

17.      **USA Now Energy Capital Group, LP** is a Texas limited partnership with its principal place of business at 3700 N. 10th, Suite 210, McAllen, Texas 75201.

18.      **Now Co. Loan Services, LLC** is Texas limited liability corporation with its principal place of business at 3700 N. 10th, Suite 210, McAllen, Texas 75201.

## STATEMENT OF FACTS

19.      Marco and Bebe Ramirez hold themselves out as successful real-estate professionals in the McAllen area.  In November 2009, the Ramirezes opened Now Co. Loan Services, LLC, a loan-restructuring firm ostensibly participating in the Making Home Affordable Program through the U.S. Departments of the Treasury and Housing and Urban Development.

20.      In March 2010, the Ramirezes formed USA Now, LLC to participate in the Immigrant Investor Program, more commonly known as EB-5.

21.      Under the EB-5 program, which is administered by USCIS, foreign investors can earn conditional and permanent visas to reside in the United States by making "at risk" investments in job-creating ventures within the United States.  To obtain a conditional visa, an EB-5 investor must present evidence that, among other things, their investment will create or preserve at least 10 full-time positions for qualifying U.S. workers.  To qualify for a permanent visa, the EB-5 investor must actually create or preserve at least 10 full-time jobs for qualifying U.S. workers within two years (or under certain circumstances, within a reasonable time after the two-year period) from the granting of the conditional visa.

22.     EB-5 investors can make their investments either directly into a business, or through EB-5 Regional Centers, which are private entities organized to promote economic development in specific geographic areas and industries.  Regional Centers are permitted by USCIS to charge investors an administrative fee for providing investment opportunities and for assisting with the preparation of the paperwork necessary to request the EB-5 visas.

23.     To obtain Regional Center designation, a company must provide USCIS with materials, typically including hypothetical business plans that show how the Regional Center intends to create the necessary jobs.  By approving a Regional Center, USCIS does not approve all the hypothetical business plans included in the application.

**USA Now's Initial Application to Be an EB-5 Regional Center**

24.     The Ramirezes applied to have USA Now approved as a Regional Center in May 2010.  The geographic area defined in the application included a number of counties in South Texas that qualify as "Targeted Employment Areas," including Hidalgo County.  It also listed various business sectors where investor funds might be used, including: (1) retail property development; (2) general office; (3) medical office; (4) senior care facility; (5) retail automobile dealership; and (6) commercial property development.  The application did not list any energy-related business.

25.     USCIS issued a Request for Evidence to USA Now on September 23, 2010, asking for additional support on several items in USA Now's application.  In particular, USCIS rejected USA Now's so-called business plans, noting that USA Now could not provide "wholly imaginary" plans and would need to provide much more detail about its planned use of investor funds.

26.     USCIS also raised concerns about the company's solicitation of investors.  Citing USA Now's website—www.usanow.com.mx—USCIS noted that it appeared the company was

offering investors a 5% return on their investment.  Because moneys contributed by an EB-5 investor in exchange for a certain percentage return would not meet the "at risk" requirement of EB-5 investments, any visa requests made under these terms would be denied.

27.    USCIS also questioned how USA Now was able to offer 5% returns if it had not yet selected an investment.  This led USCIS to directly ask whether USA Now intended to transfer EB-5 funds to Now Co. Loan Services for use in that business.

28.    USA Now responded to the Request for Evidence on November 17, 2010.  In its response, USA Now amended the list of investment opportunities that it said it intended to offer to EB-5 investors.  This new list included (1) an active lifestyle community; (2) an assisted living facility; (3) a meat processing facility; (4) an office building; and (5) a shopping center.  USA Now also provided accompanying North American Industry Classification System ("NAICS") codes for the industries it intended to operate in, along with somewhat more detailed business plans in support of these potential investments.  Again, the application did not identify any energy business or NAICS codes for such a business.

29.    USA Now's response also included a statement that was apparently intended to address USCIS's concerns about the possibility that USA Now would transfer EB-5 investor funds to Now Co. Loan Services for its use, stating that: "The Company is aware that the full amount of the requisite EB-5 investment must be made available to the business most closely responsible for creating employment upon which the petition is based."

30.    Based on these representations, USCIS approved USA Now's Regional Center Application in March 2011.

**The Ramirezes Open The Bayou Grill**

31.     At the same time they were opening the USA Now Regional Center, the Ramirezes were also opening The Bayou Grill—a Cajun-themed restaurant located in McAllen.

32.     The restaurant operates under Bayou Grill LLC, a Texas limited liability corporation formed in December 2010 at the direction of the Ramirezes.  MBMA LLC, another Ramirez entity, was named as the registered agent and a managing member; an associate of the Ramirezes was also named as a managing member.  The restaurant opened on July 4th weekend in 2011.  As discussed below, the Defendants later diverted more than $1 million of investor funds that were to be escrowed for EB-5 investments to The Bayou Grill.  The Bayou Grill is currently operating in McAllen.

33.

**USA Now Solicits Investors into the Betts Energy Project**

34.     Even before it obtained "Regional Center" designation in March 2011, USA Now had begun soliciting EB-5 investors into an investment that would purportedly focus on the purchase and expansion of Betts Oil & Butane, Inc., an existing, unaffiliated fuel wholesaler in the McAllen area.

35.     To facilitate the project, the Ramirezes formed Defendant USA Now Energy Capital Group, LP and another entity, Betts Energy, LLC.  The general partner of USA Now Energy Capital Group is Defendant Now Co. Loan Services.  The managing member of Betts Energy is Bebe Ramirez.

36.     In February 2011, Marco Ramirez sent a Letter of Intent to the owners of Betts Oil & Butane, Inc. outlining Betts Energy's intent to purchase Betts Oil & Butane for around $6.5 million.

37.     USA Now issued a Private Placement Memorandum ("Betts PPM") for this project on June 30, 2011, by which time it had already solicited four investors in the Betts Energy project.

38.     The Betts PPM told EB-5 investors they could purchase limited partnership interests in USA Now Energy Capital Group for $500,000, the minimum EB-5 investment.  According to the PPM, USA Now anticipated that it would bring in up to 60 total investors, or up to 30 EB-5 investors, for a total offering of $15 million.  The Betts PPM further noted that the investors' funds would be pooled and loaned to Betts Energy, which in turn would use the moneys to purchase and expand Betts Oil & Butane.  The Betts PPM projected that the project would "create at least 300 new direct and indirect jobs" —just enough jobs to support the visa applications for all 30 EB-5 investors that USA Now intended to bring into the investment.  Finally, the PPM represented to investors that they would receive a 5% return on their investment.

39.     The Betts PPM attributed various representations to the management of the general partner, who are identified as including Bebe and Marco Ramirez.

40.     In addition to the $500,000 capital investment, and consistent with standard practice for Regional Centers, USA Now also charged EB-5 investors a $40,000 administrative fee for investments in the Betts Energy project.

41.     Investments in the Betts Energy project, and the Defendants' other investments, were not final until the investors remitted their investment funds to a U.S.-based escrow agent and sent signed subscription agreements to USA Now in Texas, and/or the Defendants accepted and/or countersigned the subscription agreements in the United States.

42.     Despite promoting the investment as a basis to obtain an EB-5 visa, as described above, neither the Betts investments, nor any investment in an energy business, had been included in

the list of possible businesses in USA Now's Application for Regional Center.  Nor was the oil-and-gas industry covered by any of the NAICS codes submitted by USA Now in its application. Accordingly, the Ramirezes knew at the time they solicited and accepted the investments that the EB-5 investors who invested in Betts Energy had no prospect of receiving EB-5 visas from USCIS based on their investments in USA Now Energy Capital Group.

**The Ramirezes Falsely Tell Investors that the EB-5 Funds Will Be Escrowed**

43.     In addition  to falsely telling investors that they were investing in a project that would give them the opportunity to receive conditional visas and then green cards, the Ramirezes and USA Now falsely told investors that their funds would be held in escrow, pending issuance of the conditional visas.

44.     As part of their investments with USA Now, investors signed Capital Contribution Escrow Agreements (the "Escrow Agreement").  The Escrow Agreement provides that the investor's funds will be held in escrow and can only be used by USA Now if the USA Now project "receive[s] the approval on the business plan and PPM" from USCIS.  The Escrow Agreement further provides that investor funds will be removed from escrow and returned to the investor upon the investor's request or if the investor's visa application is denied.

45.     USA Now has never satisfied the condition to release any escrowed funds to a USA Now investment because none of its investments ever "received the approval on the business plan and PPM" from USCIS and no visa applications filed through the USA Now Regional Center were ever granted.

46.     Moreover, USA Now's bank records show that, contrary to the Escrow Agreement, the Ramirezes have routinely moved investor money out of the Escrow Account before USCIS has

even received an EB-5 visa application attaching the PPM, let alone approved the business plan or PPM.   Indeed, Defendants have often moved and misused investor moneys on the same day the money was received.

**The Ramirezes Misappropriate Investor Funds**

47.   Not only did USA Now fail to retain investor money in escrow, it also failed to invest the money it received from EB-5 investors in accordance with its representations to investors. Instead, as detailed below, the Ramirezes used: (1) $485,000 settling an unrelated civil lawsuit; (2) at least $500,000 making a *Ponzi* payment to a prior investor; (3) at least $1 million launching the Bayou Grill; and (4) other investor funds making payments on vehicles for themselves and USA Now employees.

*Investor 1*

48.   Investor 1[1] invested with USA Now in August 2010, not knowing that it had yet to be approved as a Regional Center.  Although Investor 1 executed an Escrow Agreement, the Ramirezes, through USA Now, immediately began spending Investor 1's money, including on a down payment for an employee's new luxury vehicle.

49.   On August 3, 2010, a $300,000 cashier's check from Investor 1 was credited into USA Now's Escrow Account.  The next day, on August 4, Bebe Ramirez signed a check paid to the order of "Now Co. Loan Services" moving that $300,000 out of USA Now's Escrow Account and into the Now Co Loan Services Account.

---

[1] All investor references are made anonymously to protect investor privacy.  The numbering does not necessarily reflect the sequence in which investors entered the program.

50.     On the same day, two Now Co. Loan Services checks totaling $6,500 made payable to a car dealership and signed by Bebe Ramirez with a memo line reading "David – down pymt" cleared the Now Co. Loan Services account.  Defendants' and public records show that a USA Now employee named David has title to a Mercedes Benz that was purchased from the same dealership at the same time the $6,500 payment was made to the dealership.

51.     Sometime around May 2011, after learning that USA Now had not yet been approved as a Regional Center, Investor 1 demanded that his/her investment be returned.  But because the Ramirezes had already spent Investor 1's money rather than hold it in escrow as agreed, USA Now was unable to refund Investor 1's investment until a new investor—Investor 3—invested his/her funds.

52.     Over the next two months, Defendants made a series of payments to Investor 1 that totaled at least $522,595.  Among these payments was a June 24, 2011 check from USA Now for $433,305 with the memo line "EB5 return."  Other smaller checks were issued to Investor 1 by both USA Now and Now Co. Loan Services.  All of the checks were signed by Bebe Ramirez.

*Investor 2*

53.     Investor 2 invested with USA Now in April 2011, two months before the Betts PPM was issued.  Investor 2 told the FBI that he or she was told that his/her money would be used as part of the Betts Energy project.  But immediately upon receipt, Investor 2's money was removed from escrow and was apparently used to pay a $500,000 settlement in an unrelated private lawsuit against the Ramirezes.

54.     On April 1, 2011, Investor 2 wired $500,000 to USA Now's Escrow Account from a bank in Mexico.  A few days later, on April 4, 2011, in an apparent effort to disguise their misuse of

funds, Defendants rapidly moved the money through various bank accounts they controlled.  First, Bebe Ramirez signed a $500,000 check from the USA Now Escrow Account and deposited it into a Bayou Grill account.   On the same day, she wrote a check from the Bayou Grill account for $485,000, which was deposited into the Now Co. Loan Services account.   Then, again on April 4, Bebe Ramirez purchased a $485,000 cashier's check out of the Now Co. Loan Services account and paid it to the order of the law firm representing her and Marco in the lawsuit filed against them as part of a settlement in that suit.  The money was never invested in the Betts Energy project.

### Investor 3

55.     Investor 3 invested in June 2011.  Despite signing an Escrow Agreement, Investor 3's funds were immediately used to make a *Ponzi* payment to Investor 1.

56.     On June 24, 2011, Investor 3 transferred $500,000 to the USA Now Escrow Account. On the same day, Bebe Ramirez signed the $433,305 USA Now Escrow Account check that was issued to Investor 1 with the memo line "EB5 return," as further described in Paragraph 49 above. Investor 3 told the FBI that s/he believes that his/her investment was invested in an EB-5 project.

### Investor 4

57.     Investor 4 signed an Escrow Agreement on May 23, 2011, and wired $500,000 into USA Now's Escrow Account on May 27, 2011.  Just days later, on May 31, Bebe Ramirez signed a $500,000 check written out of the USA Now Escrow Account that was deposited into the Bayou Grill's account.  No provision of the Escrow Agreement allowed for such a transfer and the Bayou Grill was not an approved EB-5 investment as of May 2011.  It appears, the Ramirezes simply misappropriated Investor 4's money to help launch the restaurant.

58.     In addition to Investor 4's money, at least $1 million in additional funds, including the amounts used to settle the lawsuit against the Ramirezes, was transferred from the USA Now Escrow Account to the Bayou Grill in April and May of 2011.

### USA Now Amends the PPM

59.     Despite bringing in at least seven EB-5 investors into the Betts project, USA Now's efforts to use Betts Energy to purchase Betts Oil & Butane failed.  Because the project fell through, USA Now could not provide the jobs needed to support the EB-5's investors' visa applications.

60.     Moreover, in the summer of 2012, USCIS began denying the visa applications filed by USA Now's EB-5 investors, based in part on USA Now's failure to include any industry in its application for Regional Center that related to the Betts project.  Thus, even if the Betts project had succeeded, it could not have supported the issuance of EB-5 visas to the investors.

61.     On July 2, 2012, around the same time that USCIS began denying the EB-5 investors' visa applications, USA Now and USA Now Energy Capital Group amended the Betts PPM to instead reflect a plan to use investor funds to invest in the Bayou Grill.  As demonstrated above, even before this amendment was made, Defendants had already improperly diverted more than $1 million to the restaurant.  Unlike the Betts project, the Bayou Grill was covered by one of the industry codes included in USA Now's Regional Center application material—Food Service & Drinking Places-NAICS 722.

62.     The structure of the Bayou Grill PPM is similar to the Betts PPM—it claims the investors' funds will be pooled by USA Now Energy Capital Group, loaned to Bayou Grill LLC to operate and expand the restaurant, and used to generate a 5% return to the investors.  But rather than the $15 million originally anticipated by the Betts PPM, the Bayou Grill PPM states that the $3.5

million—the exact amount already invested or committed by the seven Betts investors—would be loaned to the Bayou Grill.

63.     These investors filed new EB-5 applications based on the Bayou Grill PPM.  These applications are still pending with USCIS; no USA Now investors have obtained EB-5 visas through the Regional Center.

### The Ramirezes Misrepresent the Current Status of Investor Funds

64.     On December 12, 2012, Now Co. Loan Services generated account statements for each of the remaining Investors, showing their purported capital balances in USA Now Energy Capital Group, LP and calculating their interest earned at a 5% annual rate over the term of their investment.  The letter accompanying the statement, and addressed from Marco Ramirez, falsely stated that the proceeds from the investment had been used in accordance with the relevant PPMs.

### FBI Search Warrant

65.     On July 18, 2013, U.S. Magistrate Judge Ormsby approved a search warrant allowing the FBI to search Defendants' offices and the Ramirez residence.  *In the Matter of the Search of The office of USA Now*, Case No. M-13-1303-M (S.D. Texas, July 18, 2013).  Pursuant to the warrant, the FBI seized various materials from Defendants' offices and the Ramirez residence, including materials that further demonstrate that the Defendants have been operating an investment fraud.

### The Ramirezes Are Continuing To Solicit New EB-5 Investors

66.     In the past year, the Ramirezes have expanded their solicitation of EB-5 investors beyond Mexico to include potential investors in Egypt and Nigeria.

67.     In September and November 2012, Marco Ramirez and others from USA Now traveled to Cairo, Egypt, where they pitched their EB-5 program to Egyptian investors.

68.     In February of 2013, USA Now ran advertisements and editorials in various Nigerian newspapers soliciting EB-5 investments and opened two accounts at a Nigerian bank.  Both Marco Ramirez and another USA Now employee traveled to Nigeria at least twice in 2013.  When they returned to the United States from a September 2013 trip, Marco Ramirez told U.S. Customs agents that he had been in Nigeria soliciting investors.

69.     These new EB-5 investors are purportedly being placed into new investments focused on the development of hotels and restaurants in areas convenient to oil-and-gas operations in South Texas.  The investments were solicited under the name Eagle Ford Instalodge Group, LP, which issued a PPM on February 25, 2013, and amended on April 2, 2013.  The Defendants recently purchased land in South Texas, ostensibly in furtherance of this Eagle Ford PPM.  The purchase price of this land was in excess of $1.5 million.

70.     Defendants' conduct in the Eagle Ford investment appears consistent with their fraudulent practice discussed above.  For example, they have already diverted at least a portion of funds that were apparently obtained for the use by Eagle Ford for other purposes, including payments to the Bayou Grill.

## CLAIMS

### FIRST CLAIM
### Violations of Section 17(a) of the Securities Act
### (All Defendants)

71.     The Commission repeats and incorporates paragraphs 1 through 70 of this Complaint as if set forth verbatim.

72.     Defendants, directly or indirectly, singly, in concert with others, in the offer and sale of securities, by use of the means and instruments of transportation and communication in

interstate commerce and by use of the mails, has: (a) employed devices, schemes or artifices to defraud; (b) obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, practices or courses of business which operate or would operate as a fraud or deceit.

73.     Defendants engaged in the above-referenced conduct, knowingly or with severe recklessness.  Defendants were also negligent in their actions regarding the representations and omissions alleged herein.

74.     For these reasons, Defendants violated, and unless restrained and enjoined, will continue to violate Section 17(a) of the Securities Act.

**SECOND CLAIM**
**Violation of Section 10(b) of the Exchange Act and Rule 10b-5**
**(All Defendants)**

75.     The Commission repeats and incorporates paragraphs 1 through 70 of this Complaint by reference.

76.     Defendants, directly or indirectly, singly or in concert with others, in connection with the purchase and sale of securities, by use of the means and instrumentalities of interstate commerce and by use of the mails have: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and  (c) engaged in acts, practices and courses of business which operate as a fraud and deceit upon purchasers, prospective purchasers and other persons.

77. Defendants engaged in the above-referenced conduct, intentionally, knowingly or with severe recklessness regarding the truth.

78. For these reasons, Defendants violated and, unless restrained and enjoined, will continue to violate Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

### THIRD CLAIM
### Aiding and Abetting Violations of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5
**(All Defendants)**

79. The Commission repeats and incorporates paragraphs 1 through 70 of this Complaint by reference.

80. Each of the Defendants, directly or indirectly, singly, in concert with others, in the offer and sale of securities, by use of the means and instruments of transportation and communication in interstate commerce and by use of the mails, has: (a) employed devices, schemes or artifices to defraud; (b) obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, practices or courses of business which operate or would operate as a fraud or deceit.

81. Also each of the Defendants, directly or indirectly, singly or in concert with others, in connection with the purchase and sale of securities, by use of the means and instrumentalities of interstate commerce and by use of the mails have: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices and courses of

business which operate as a fraud and deceit upon purchasers, prospective purchasers and other persons.

82.     Each of the Defendants also knowingly or recklessly substantially assisted each of the other Defendants' violations of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

83.     For these reasons, each of the Defendants aided and abetted each of the other Defendants' violations of, and, unless restrained and enjoined, will continue to aid and abet violations of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

## RELIEF REQUESTED

The Commission respectfully requests that this Court:

1)      Issue findings of fact and conclusions of law that Defendants committed the violations charged and alleged herein;

2)      Enter an order temporarily, preliminarily, and permanently restraining and enjoining Defendants, and, as appropriate, their agents, servants, employees, attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from future violations of Section 17(a) [15 U.S.C. § 77q(a)] of the Securities Act, Section 10(b) [15 U.S.C. § 78j(b)] of  the Exchange Act, and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder and from soliciting or accepting funds from any person or entity for any investment in any unregistered offering of securities;

3)      Enter an order freezing the assets of Defendants;

4)      Enter an order requiring Defendants to prepare a sworn accounting of all the

money they have obtained from investors, including (1) a report on the disposition an current location of the money, and (2) disclosure of all bank and brokerage account number whey the deposited the money;

5)      Enter an order prohibiting the movement, alteration, and destruction of books and records to protect the books and records showing the location of assets and the disposition of their clients' money and to protect all remaining documents necessary for full discovery in this matter;

6)      Enter an order directing financial institutions and others to identify accounts and safeguard assets;

7)      Enter an order requiring Defendants to surrender their passports to the Court and prohibiting them from traveling outside the United States without the Court's approval;

8)      Enter an order authorizing expedited discovery;

9)      Enter an order appointing a receiver;

10)     Enter an order directing Defendants to disgorge an amount equal to the funds and benefits they obtained illegally as a result of the violations alleged, plus prejudgment interest on that amount.

11)     Enter an order directing Defendants to pay civil monetary penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)] for his violations of the federal securities laws.

12)      Such further relief in law or equity that this Court may deem just and proper.


Dated: September 30, 2013            Respectfully Submitted,

                                      s/ Timothy L. Evans

                                      Timothy L. Evans
                                      Texas Bar No. 24065211
                                      S.D. Tex. Bar No. 1742859
                                      (Attorney-in-Charge)

                                      David B. Reece
                                      Texas Bar No. 24002810
                                      S.D. Tex. Bar No. 896560

                                      United States Securities and Exchange
                                      Commission
                                      801 Cherry Street, Suite 1900
                                      Fort Worth, Texas 76102
                                      Telephone: (817) 978-5036 (Evans)
                                      Fax: (817) 978-4927
                                      evanstim@sec.gov

                                      ATTORNEYS FOR PLAINTIFF
                                      SECURITIES AND EXCHANGE
                                      COMMISSION